IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN ELMS,<br><br>               *Plaintiff,*<br><br>     v.<br><br>WEST CHESTER BOROUGH,<br><br>               *Defendant.* | Case No. 2:21-cv-00279-JDW |

## <u>MEMORANDUM</u>

John Elms worked for the West Chester Borough, which offered a working environment that was far from perfect. His supervisor mocked and insulted him on more than one occasion after he had a stroke. He argues that his supervisor's behavior constituted harassment under the Americans with Disabilities Act, that he engaged in protected activity when he vented to others about the behavior, and that he was fired for doing so. One might find the Borough's conduct unsavory, but Mr. Elms does not offer evidence that it constituted disparate treatment or retaliation based on a disability. He also has not shown that the Borough's legitimate reasons for terminating him were pretextual. The Borough is entitled to summary judgment on these claims. The Borough is not, however, entitled to summary judgment on Mr. Elms's hostile work environment claim because it did not make any argument about that claim.

I.    FACTUAL BACKGROUND

A.    **Mr. Elms's Work Performance**

Mr. Elms was the Director of Parking Services at the Borough from August 1, 2016, to July 28, 2020. When he first started his employment, he had "slight pain" in his hip and difficulty walking fast. (ECF No. 14-4 at 44.) But he did not tell anyone with the Borough

that he needed an accommodation when he applied or when he started work. In 2018, Mr. Elms suffered a stroke, and his limitations worsened. He developed a "slight limp" and walked slowly. (*Id.* at 45.) He also experienced some memory issues and suffered occasional bouts of gout that caused him to miss two to four days of work. Between September 2018 and November 2018, Mr. Elms sent his supervisor, Michael Perrone, four emails discussing his health issues and requesting time off. The Borough permitted Mr. Elms to take off as much time as he needed. Apart from the gout flare-ups, Mr. Elms's worsened limitations did not prevent him from doing anything. He did not request any changes to his job duties as a result of his limitations.

In a performance review for calendar year 2018, Mr. Perrone told Mr. Elms that he needed to "[l]earn to prioritize work and push to complete goals in a timely manner." (ECF No. 14-5 at 2.) He also told Mr. Elms to "[k]eep [his] work area tidy at all times." (*Id.*) Then, in a review for calendar year 2019, Mr. Perrone told Mr. Elms that his "[q]uality of work is poor to average, because your organizational skills need improvement. This starts with an organized desk and office. I have repeatedly asked you to clean up your work office." (ECF No. 14-6 at 1.) Mr. Perrone also noted that "[t]asks are slow to be completed and are not typically done in a timely fashion." (*Id.* at 2.)

B.    The Alleged Discrimination Against Mr. Elms

In 2018 or 2019, Mr. Elms, the Borough manager Mike Perrone, and approximately six contractors needed to look at something on the roof of a garage. When Mr. Perrone started up the stairs, the rest of the group, including Mr. Elms, followed. Mr. Perrone did not tell Mr. Elms to take the stairs, but Mr. Elms thought Mr. Perrone would be disappointed if he took the elevator. Notwithstanding Mr. Elms's apprehension, nothing prevented him from taking the elevator that day.

In 2020, Mr. Elms had a meeting with Mr. Perrone at a location one-and-a-half blocks from the Borough Hall. Mr. Elms walked towards his car, but Mr. Perrone gestured him to "come on," meaning to walk to the meeting. (ECF No. 14-4 at 32.) Mr. Perrone did not tell Mr. Elms that he was required to walk to the meeting, and Mr. Elms did not tell Mr. Perrone that he was having health problems and wanted to drive.

In 2018 or 2019, on three separate occasions over several months, Mr. Perrone and Borough Councilman Bernie Flynn entered Mr. Elms's office and asked if Mr. Elms had a box. Mr. Elms interpreted Mr. Perrone's and Councilman Flynn's actions to mean that he was getting fired. Mr. Elms then spoke to the Mayor—a supervisor only to the police, not to Mr. Elms—and "vented" about his exchanges with Mr. Perrone and Councilman Flynn. But he did not complain about any other aspect of his employment. Nor did he ask the Mayor to take any action regarding Mr. Perrone's behavior.

### C.    The Alleged Retaliation Against Mr. Elms

At some point, Mr. Perrone learned that Mr. Elms had vented to the Mayor. After that, Mr. Perrone treated Mr. Elms poorly. On two occasions, Mr. Perrone followed Mr. Elms down a hallway imitating Frankenstein. On numerous occasions (between 50 and 100, according to Mr. Elms), Mr. Perrone also told Mr. Elms to walk faster. Mr. Perrone also referred to Mr. Elms as "the crippled man" in conversations with his assistant. (ECF No. 14-4 at 65.) Mr. Elms knew of the Borough's policies regarding reporting harassment and discriminatory treatment. But he did not complain to anyone about Mr. Perrone asking him to walk faster, nor did he report that he believed this statement was related to any disability.

In 2019 or 2020, Mr. Elms spoke to Karen Armstead, the Director of Human Resources, about his health issues and about the encounters with Mr. Perrone and

Councilman Flynn in his office. He told Ms. Armstead to keep their discussion about Mr. Perrone and Councilman Flynn "off the record." (*Id.* at 60.) He did not ask Ms. Armstead to take action regarding the behaviors he felt constituted harassment, nor did he document the alleged harassment in any letters or emails. During this meeting, Ms. Armstead "may have" provided Mr. Elms with Family and Medical Leave Act paperwork. Mr. Elms had read the Borough's FMLA policy, which states that if an employee needs an accommodation for a disability, he should contact Ms. Armstead. Mr. Elms did not attempt to fill out the FMLA paperwork. He testified that he "never in [his] recollection wanted to do FMLA or anything, because [he] wanted to do [his] job." (*Id.* at 81 ¶¶ 10-18.)

### D.    Mr. Elms's Termination

In March 2020, Mr. Elms asked a furloughed employee to perform work on behalf of the Borough, despite instructions not to do so. Mr. Elms then lied to Mr. Perrone about using furloughed employees to complete Borough businesses. In July 2020, the Borough learned that Mr. Elms had been saving envelopes with checks and cash dating back to April and May 2020, which violated Borough financial policies. As a result of the violations and deceit, the Borough suspended Mr. Elms on July 20, 2020. It terminated him eight days later. Following the termination, Mr. Perrone told Mr. Elms that the Borough would revoke his unemployment benefits if he talked about Mr. Perrone or the Borough.

### E.    Procedural History

On January 21, 2021, Mr. Elms filed this suit against the Borough and Mr. Perrone discrimination and retaliation in violation of the ADA. After discovery, the Borough moved for summary judgment on each of Mr. Elms's claims, and that motion is now ripe.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). In considering a motion for summary judgment, a district court may not make credibility determinations. *See Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). If a "moving party has demonstrated the absence of a genuine issue of material fact—meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole—concerns regarding the credibility of witnesses cannot defeat summary judgment." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998).

III.   ANALYSIS

A.   Discrimination/Retaliation Claims

The Court analyzes Mr. Elms's ADA claims for disparate treatment and retaliation under the three-step *McDonnell-Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, an employee must establish a *prima facie* case of discrimination. Then, the employer has a burden of production (but not persuasion) to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 n. 11 (3d Cir. 2004). If the employer articulates such a reason, the employee must then proffer evidence to allow a reasonable factfinder to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual. *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (*per curiam*). Because the evidence concerning a legitimate non-discriminatory reason and pretext is the same for the disparate treatment and retaliation claims, the Court addresses them together.

1.   *Prima facie* case

a.   Discrimination

"In order for a plaintiff to establish a *prima facie* case of discrimination under the ADA, the plaintiff must show: '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.'" *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (quoting *Gaul v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir.1998) (citation omitted). "[A]n employer discriminates against a qualified individual with a disability when the employer does 'not mak[e] reasonable

6

accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)). The employee must "provide[] the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and *desire for an accommodation.*" *Id.* at 313 (emphasis added). Accordingly, "[e]mployers cannot assume employees are disabled and need accommodations." *Id.*

Mr. Elms never expressed a desire for an accommodation under the ADA or provided the Borough with enough information that the Borough had a reason to know he wanted an accommodation. He did not tell Mr. Perrone or anyone else from the Borough that he could not walk up stairs at the garage, either at the time he was asked to do so or any other time. He also did not tell Mr. Perrone or anyone else that he could not walk from the Municipal Building to a meeting in 2020, either at the time of the meeting or otherwise. Instead, he chose to stay silent about what he thought he needed. In fact, he declined even to seek FMLA leave when the Borough gave him FMLA forms. All of this suggests that he did not request an accommodation, so the Borough had no basis to give him one. The Borough was not required to assume that Mr. Elms was disabled and needed accommodations. *See Taylor*, 184 F.3d at 306.

Nothing that Mr. Elms did while employed changes this analysis. He told the Borough in emails in 2018 that he needed time off from work, and he got it. He did not suggest that he needed any other accommodation upon his return. He also vented frustrations to the Mayor, but he did not tell the Mayor about a needed accommodation or ask for a change in his working conditions.

Even if Mr. Elms had some evidence that he had requested an accommodation, he has no evidence that the Borough took any action against him as a result of his disability. He points only to his 2019 performance review, but other than the fact that it came after his stroke, he has offered no evidence to tie the comments in his review to his disability. For example, there is nothing about the criticism of his cleanliness that had to do with his stroke. Nor has he shown that his stroke slowed his ability to complete tasks. He therefore has not made the required showing.

### b.     Retaliation

To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protective activity; and (3) a causal connection between the employee's protective activity and the employer's adverse action. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). Protected activity includes formal charges of discrimination as well as informal protests of discriminatory employment practices such as complaints to management. *See Barber v. CSX Distribution Svcs.*, 68 F.3d 694, 702 (3d Cir. 1995). What matters is the message, "not the medium of conveyance." *Id.* To be protected activity, an employee must complain of conduct that he reasonably and in good faith believes violates the ADA. *See Tyson v. Access Svcs.*, 158 F. Supp.3d 309, 315 (E.D. Pa. 2016).

Mr. Elms has no evidence that he engaged in protected conduct. He never filed formal charges of discrimination or made informal protests of discriminatory practices by his colleagues. As a result, none of the conduct about which he complains flows from complaints about disability discrimination. Mr. Elms did vent to the Mayor and talk to Ms. Armstead about the way that Mr. Perrone and Councilman Flynn treated him. But he has

no evidence that would make it reasonable for Mr. Elms to link that boorish behavior to any request he might have made for an accommodation. In addition, Mr. Elms knew that the Mayor was not "management" for his purposes. (ECF No. 14-4 at 54–55). Not every complaint at work constitutes protected activity. The undisputed facts establish that Mr. Elms's complaints focused on boorish conduct by Mr. Perrone and Councilman Flynn, not on a request for an accommodation. It therefore cannot form the predicate for a retaliation claim.

In any event, Mr. Elms cannot show a causal connection between any protected conduct and an adverse employment decision. To show a causal connection, a plaintiff must show either an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or a pattern of antagonism coupled with timing to establish a causal link. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). A "pattern of antagonism" is a consistent and continuous pattern of conduct, which can include a constant barrage of written and verbal warnings, as well as disciplinary action. *See Bartos v. MHM Corr. Servs., Inc.*, 454 F. App'x 74, 79 (3d Cir. 2011). Mr. Elms has not shown that his termination occurred in close temporal proximity to his conversations with Ms. Armstead or the Mayor. And, while he has shown a few incidents of antagonistic behavior, he did not receive any written and verbal warnings, let alone a barrage of them, and Mr. Perrone's conduct more generally was a few instances of boorish behavior, not a consistent and continuous pattern of conduct. Mr. Elms therefore has not proven a prima facie case of retaliation.

### 2.    Legitimate nondiscriminatory reason

The Borough argues that it terminated Mr. Elms because he contacted a furloughed employee, lied to his manager about the interaction, and failed to follow Borough policies.

That justification satisfies its burden of articulating a legitimate, nondiscriminatory reason. Mr. Elms does not contend otherwise.

### 3.    Pretext

To prove that the Borough's reason for his termination was pretext, Mr. Elms must offer evidence to permit a juror either to disbelieve the Borough's reason for his termination or "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (cleaned up); *see also Fasold v. Justice*, 409 F.3d 178, 185 (3d Cir. 2005). To do that, he must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the Borough's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 766. In cases where "the temporal proximity is not so close as to be unduly suggestive" of causation, the trial court may examine "timing plus other evidence...." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).

In its Motion, the Borough argues that Mr. Elms cannot prove pretext. Mr. Elms does not respond to that argument. "[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure constitutes an abandonment of those causes of action and essentially acts as a waiver of these issues." *Campbell v. Jefferson Univ. Physicians*, 222 F. Supp.3d 478, 487 (E.D. Pa. 2014) (cleaned up and citation omitted). On that basis alone, the Court concludes that Mr. Elms has not demonstrated pretext.

In addition, the Court's facial review of the record demonstrates an absence of evidence of pretext. Nothing before the Court would permit a juror to disbelieve the

Borough's explanation for Mr. Elms's termination. Mr. Elms concedes that he contacted a furloughed employee, lied to his manager about the interaction, and failed to follow Borough policies.

There is also no evidence suggesting that discrimination was the real but for cause of any adverse job action. His 2019 performance review came more than a year after his stroke, with no pattern of intervening conduct to suggest that discrimination led to the negative aspects of that review. In addition, the discriminatory acts—making him walk the stairs and making him walk to a meeting—were not close in time to his termination. Nor was his termination close in time to, or causally related to, any of his supposed protected conduct. Finally, Mr. Perrone's purported threat to revoke Mr. Elms's employee benefits does not indicate that he fired Mr. Elms for a discriminatory reason. Thus, Mr. Elms's claim fails for a lack of pretext, as well as a failure to prove a prima facie case.

## B.    Hostile Work Environment Claim

In his Complaint, Mr. Elms asserts that he was "subject to a hostile work environment due to his disability." (ECF No. 1 at ¶ 31.) The Borough acknowledges that claim in its Statement of Undisputed Material Facts and in its brief in support of this Motion. (ECF No. 12 at 3 (¶ 3), 10). But the Borough does not make any argument about the hostile work environment claim in its brief. Mr. Elms does (ECF No. 14-3 at 10), yet the Borough ignores the issue again in its reply. Rule. 56 requires a movant to "show[] that there is no genuine dispute as to any fact." Fed. R. Civ. P. 56(a). Having ignored the issue, the Borough has not met that burden. So the Court will deny summary judgment on Mr. Elms's hostile work environment claim.

IV.     CONCLUSION

Because Mr. Elms has failed to demonstrate the existence of essential elements of

his claims for disparate treatment and retaliation. But, because the Borough did not

address his hostile work environment claim, the Court has no basis to award summary

judgment on that claim. The Court will therefore grant the Borough's Motion in part. An

appropriate Order follows.

BY THE COURT

*/s/ Joshua D. Wolson*
HON. JOSHUA D. WOLSON
United States District Judge

October 28, 2021